# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOE, A MINOR CHILD,** | ) | |
| **THROUGH HIS PARENTS,** | ) | |
| **J.H. and M.H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:20-cv-00947** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | |
| | ) | |
| **ANDREW HERMAN, Individually, and** | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The Complaint in this case sets forth causes of action under 42 U.S.C. § 1983 ("§ 1983")

and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d), and a state law

negligence claim. Now before the court are (1) a motion to dismiss filed as a "Memorandum of

Law in Support of Its Motion to Dismiss" (Doc. No. 11) filed on behalf of former-defendant

Metropolitan Nashville Public Schools ("MNPS") by the Metropolitan Government of Nashville

and Davidson County ("Metro") (which has now been substituted for MNPS as the appropriate

defendant[1]), supported by a separate Memorandum of Law[2] (Doc. No. 12); and (2) defendant

---

[1] Contemporaneously with this filing, Metro filed an unopposed Motion to Substitute itself
as the proper defendant in this case, as MNPS is merely a department within Metro and not a
separate, suable legal entity. (Doc. No. 10.) The court granted that motion, as a result of which
MNPS is no longer a defendant.

[2] Metro filed both what appears to be a motion and a separate Memorandum of Law, though
the title of both is "Metropolitan Nashville Public Schools Memorandum of Law in Support of Its
Motion to Dismiss." (Doc. Nos. 11, 12.)

Andrew Herman's Motion to Dismiss (Doc. No. 8), supported by a Memorandum of Law (Doc. No. 9).

For the reasons set forth herein, the court will grant Metro's motion, dismissing the § 1983 and Title VI claims with prejudice and the state law negligence claim without prejudice. The court will decline to exercise supplemental jurisdiction over the state law claim and, therefore, will deny as moot Herman's Motion to Dismiss.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

John Doe, a minor, pursues this action through his parents, J.H. and M.H., who filed a Complaint on his behalf on November 3, 2020. (Doc. No. 1.)[3] The Complaint alleges that John Doe and his parents reside in Davidson County, that John Doe attends a public school within Davidson County, Tennessee, that he has a disability (autism), and that he is African American. (*Id.* ¶¶ 1, 15.) During the 2019–2020 school year, John Doe was in the fourth grade, and his teacher was defendant Herman. (*Id.* ¶ 15.) Herman and MNPS personnel allegedly knew that John Doe's developmental disability affects his comprehension, learning, social interaction, and communication and that his "disability involves not knowing whether to take statements *literally* and understanding context." (*Id.* ¶ 16.)

A Vanderbilt University student teacher was assigned to work at Herman's school and with Herman's class for some period of time during the 2019–2020 school year.[4] In February 2020, the student teacher designed a lesson on racism and slavery, to correspond with Black History Month, that she proposed teaching to the Black and White fourth-grade children in Herman's class. (*Id.*

---

[3] Although the Complaint refers to John Doe and his parents collectively as "plaintiffs," John Doe is technically the only plaintiff. The court will refer to him as such, or by the name John Doe, as distinct from his parents.

[4] The student teacher's race is not identified in the Complaint, but Herman's Memorandum in support of his Motion to Dismiss states that she is African American. (Doc. No. 9, at 2 n.4.)

¶ 6.) Herman reviewed and approved the lesson plan. (*Id.* ¶ 15.)

This planned lesson was presented to Herman's class on February 3 and 4, 2020. The lesson included the presentation of an "apocryphal" speech, "said to have been given in the 1700s by a plantation owner from the West Indies, Willie Lynch, to white Virginia colonists on the subject of how to control their slaves." (*Id.* ¶ 7.) This speech, entitled "Let's Make a Slave," included language that is demeaning and derogatory toward African Americans, comparing them to horses and urging slave owners to "break" their slaves; it also graphically described and recommended horrific punishments that Lynch believed to be effective in controlling slaves, including bullwhipping and "tarring and feathering and setting blacks on fire," in order to "put the fear of God" in them. (*Id.* ¶¶ 9–10.) Among other things, the speech further recommended segregating enslaved people by age, color, intelligence, and the texture of their hair, setting them to compete against each other so that they would love and trust only their White owners, instilling in them a "frozen subconscious fear for [their] life," in order to make them "mentally dependent and weak, but physically strong," and "breeding" them to perpetuate "the cycle." (*Id.* ¶¶ 11–12.) The student teacher had the fourth-grade students, Black and White, read this speech "aloud amongst each other and answer questions" on February 3, 2020. (*Id.* ¶¶ 13, 17.)

The next day, on February 4, 2020, the lesson continued with a segment in which the children were made to "pretend they were *actual slaves* trying to be shipped away from their slaveowners" (*id.* ¶ 19) and to "pretend[] to seek freedom from slavery by being mailed away in a box" by "folding themselves under their desks." (*Id.* ¶¶ 19 20.) The students were instructed that, if they moved, they would be caught and returned to a life of slavery. (*Id.* ¶ 20.)

The Complaint asserts that the lesson, as proposed, even before it was actually taught, was so "vile, hurtful, and *obviously inappropriate* for fourth graders" that any "sane" educator would

have rejected it as "inconsistent" with both "Tennessee's approved standard for teaching Fourth Grade Social Studies" and MNPS's "approved Scope and Sequence" for teaching pre-Civil War United States history. (*Id.* ¶ 14 (emphasis in original).) Herman nonetheless approved the lesson and, moreover, did not intervene during the teaching of the lesson. (*Id.* ¶¶ 15, 22.) The lesson was also observed by "special education teacher(s)" and "a paraprofessional," who likewise did not intervene. (*Id.* ¶ 22.)[5]

The Complaint alleges that the plaintiff, "an African American little boy with autism," was literally terrified by this lesson, which the Complaint describes as "two days of repeating racial trauma, inflicted upon John Doe *by adults*." (*Id.* ¶ 21.)

The "Let's Make a Slave kit" was "stuffed" into the plaintiff's backpack and discovered by his mother.[6] (*Id.* ¶ 23.) On February 4, 2020, John Doe's mother reported finding the material to MNPS's administration. (*Id.* ¶ 24.) The Complaint does not allege that any other parents or students complained about the lesson, but MNPS's administration, after speaking with Herman and the student teacher, issued a statement that it "regrets if any students or parents were caused pain as a result of this incident." (*Id.*) The student teacher was removed from the classroom and Herman was placed on a brief administrative leave. (*Id.* ¶ 25.) John Doe's mother was advised by MNPS that Vanderbilt University's education department had approved the material. (*Id.*) Metro "undertook no corrective actions to wash the taught-filth from the impressionable children's minds." (*Id.*)

The incident continued to have repercussions for John Doe, however. "Foreseeably,"

_____

[5] The Complaint does not identify the "special education teacher(s)" or paraprofessional by name.

[6] The Complaint speculates that "either a special education teacher, or perhaps the paraprofessional" "stuffed" the lesson documentation into John Doe's backpack "so that his family could see what was going on." (Doc. No. 1 ¶ 23.)

according to the Complaint, his classmates "joked" about the Black History lesson afterward, and "[t]hey told John Doe, 'you are my slave,' reinforcing in his mind his status as a slave." (*Id.* ¶ 26.) John Doe suffered anxiety as a result of this lesson and the subsequent teasing, becoming fearful about being separated from his family, mailed in a box, and sold as a slave, and he also worried about his own family members. (*Id.* ¶ 27.) He asked his mother if he could change his skin color in order to be "safe." (*Id.*)

Following his brief leave, Herman returned to the classroom and resumed teaching. One of the lessons introduced shortly after the "Let's Make a Slave" lesson involved the presentation of the book *Freedom Over Me*. (*Id.* ¶ 28.) The Complaint concedes that this book, which gives the actual sale prices of enslaved individuals, has "won awards for realism in addressing the slave trade."[7] (*Id.* ¶ 29.) The Complaint asserts that, because the book was "presented in the immediate aftermath and context of a racially hostile environment," John Doe suffered "additional fears," due to his tendency to "ruminat[e] and tak[e] things literally." (*Id.*)

The Complaint asserts that Herman and MNPS presented all of these lessons to John Doe despite knowledge of his disability and particular sensitivities, as a result of which he continues to suffer "fears caused by the racially hostile educational environment including fear of being black,

---

[7] The plaintiff does not attach a copy of this book to the Complaint. Metro asserts that the actual title of the book is *Freedom Over Me: Lives and Dreams Brought to Life* (referred to herein simply as *Freedom Over Me*) and that, while it "includes prices that were assigned to slaves, the book focuses on the intrinsic worth of people and the dreams of the individuals featured." (Doc. No. 12, at 4.) Metro does not attach an entire copy of the book to its Motion to Dismiss, but it provides a link to the publisher's website featuring the book: https://www.simonandschuster.com/books/Freedom-Over-Me/Ashley-Bryan/9781481456906. On the website, the book is identified as a "Newberry Honor Book," a "Coretta Scott King Author Honor Book," and a "Coretta Scott King Illustrator Honor Book." It is described as "using original slave auction and plantation estate documents" and as "offer[ing] a moving and powerful picture book that contrasts the monetary value of a person with the priceless value of life experiences and dreams that a slave owner could never take away." *Id.*

fear of losing his family, and fear of being a slave." (*Id.* ¶ 30.) The Complaint asserts that MNPS "failed to train its employees on how to prevent racial harassment and it was deliberately indifferent to teacher-on-student racial harassment." (*Id.* ¶ 31.) It further asserts that there existed an obvious need for such training on preventing and handling racial harassment. (*Id.* ¶¶ 31, 32.)

Based upon these allegations, the Complaint sets forth causes of action against Metro under 42 U.S.C. § 1983, for violation of the plaintiff's right to equal protection (Count I) and for racial harassment by adults and peers that interfered with John Doe's education, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count II), and a state law negligence claim against both Metro and Herman (Count III).

The defendants separately seek dismissal of all claims against them under Rule 12(b)(6). The plaintiff has filed a Response in opposition to each motion (Doc. Nos. 18, 19), and the defendants filed separate Reply briefs (Doc. Nos. 20, 21.)

## II. STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider, not only the complaint and exhibits attached to it, but also exhibits attached to defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted).

## III.    DISCUSSION

### A.    Metro's Motion

#### 1.    Title VI Claim

The Title VI claim (Count II) is premised upon allegations that John Doe "suffered repeated acts of racial harassment by adults, *and* by peers," that Metro had "actual knowledge of the harassment [and] was deliberately indifferent to the circumstances," and that the "repeating racially hostile educational environment" had a harmful effect on John Doe, detracted from his educational experience, and caused him emotional damages. (Doc. No. 1 ¶¶ 37, 38.) The

"harassment" claim appears to be based on three events: (1) defendant Herman's approval of, and failure to intervene in, the student teacher's two-day "Let's Make a Slave" lesson; (2) Herman's teaching of the book, *Freedom Over Me*; and (3) John Doe's classmates' joking about the lesson on the playground.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. It has long been recognized that private individuals may bring suit to enforce this provision and, if they prevail, may recover injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001) (citations omitted). Title VI prohibits only intentional discrimination. *Id.* at 289.

*Sandoval* did not attempt to define intentional discrimination or address whether a defendant's deliberate indifference to harassment or a hostile environment may qualify as intentional discrimination under Title VI. Nor has the Sixth Circuit "had the opportunity to consider whether a plaintiff can allege deliberate indifference to racial discrimination or harassment under Title VI." *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 342 (6th Cir. 2012).[8] However, it is clear that a school district may be liable for damages under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, where it is deliberately indifferent to known acts of teacher-student or peer-on-peer *sexual* harassment. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S.

---

[8] In *Thompson*, because the court found that the plaintiff failed to raise a genuine issue of material fact as to the defendant's deliberate indifference to her teacher-on-student race discrimination claim, the court "assume[d] without deciding that deliberate indifference claims are cognizable for racial discrimination under Title VI." *Thompson*, 639 F. App'x at 342.

629, 643 (1999). In addition, the Supreme Court has recognized that the standards under the two statutes are the same. *See, e.g.*, *Gebser*, 524 U.S. at 286 ("[Title VI] is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. The two statutes operate in the same manner . . . ." (citations omitted)). And other federal appellate courts, "noting that Title IX was based on Title VI," have held that "a school can be liable for deliberate indifference to racial harassment under Title VI" as well. *Thompson*, 639 F. App'x at 342 (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.10 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I–38*, 334 F.3d 928, 934 (10th Cir. 2003)). The district courts within this circuit have long presumed that the Sixth Circuit would do so as well, given the opportunity. *See, e.g.*, *Est. of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 803 (S.D. Ohio 2018); *Maislin v. Tenn. State Univ.*, 665 F. Supp. 2d 922, 929 (M.D. Tenn. 2009) (Trauger, J.) ("It is settled that, under Title IX, a defendant's deliberate indifference to a hostile environment or to a third party's harassment can constitute intentional discrimination. . . . Because of the close parallels between Title IX and Title VI, deliberate indifference claims should also be allowed under the latter." (citations omitted)). This court continues to presume that deliberate indifference claims may proceed under Title VI.

The Sixth Circuit has provided a recent exegesis of the standard set forth in *Davis*, pertaining to peer-on-peer sexual harassment in a Title IX case. *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 554 (2020). Construing and applying the standard articulated in *Davis*, the court held in *Kollaritsch* that, to withstand a Rule 12(b)(6) motion to dismiss a Title IX claim, "a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-

victim, which caused the Title IX injuries." *Id.* at 618. This court finds that *Kollaritsch* also applies to Title VI race discrimination claims, both those based on peer-on-peer harassment and those based on teacher conduct. *See Williams ex re. Hart v. Paint Valley Local School Dist.*, 400 F.3d 360, 368 (6th Cir. 2005) ("The Court in *Davis* was explaining the standard laid down in *Gebser*. There is no indication that a different standard was intended by the Court in peer harassment cases and teacher harassment cases.").

Metro argues that the plaintiff's Title VI claim is subject to dismissal on the grounds that: (1) the Complaint does not allege actionable harassment; and (2) the Complaint does not allege facts showing that the school was deliberately indifferent to complaints of racial discrimination or harassment.

a)      *Actionable Harassment*

In *Kollaritsch*, in the context of alleged sexual harassment by a student against another student, the Sixth Circuit defined "actionable harassment" as "some type of aggressive and antagonistic behavior" that is "(a) severe, (a) pervasive, and (c) objectively offensive." *Kollaritsch*, 944 F.3d at 619 (citing Davis, 526 U.S. at 651). *Davis* and *Kollaritsch* helpfully defined each of these terms as well:

> "Severe" means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass. . . . "[S]imple acts of teasing and name-calling" are not enough, "even where these comments target differences in gender." . . .

> "Pervasive" means "systemic" or "widespread," but for our purposes, it also means multiple incidents of harassment; one incident of harassment is not enough. . . . That a single incident is insufficient on its own to state a claim correspondingly adds further support to the requirement that at least one more (further) incident of harassment, after the school has actual knowledge and implements a response, is necessary to state a claim.

> "Objectively offensive" means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively. "Whether gender-oriented conduct rises to the level of actionable

harassment thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." The victim's perceptions are not determinative.

*Id.* at 620–21 (quoting *Davis*, 526 U.S. at 651–53).

The plaintiff here argues that a different standard should apply when the "harassment" is perpetrated by a teacher. Indeed, *Davis* implicitly recognized that the type of conduct that might have the effect of denying the victim equal access to an educational opportunity might vary depending upon whether the perpetrator is a peer or a teacher. In that regard, the Supreme Court found it "relevant" that "it was a teacher who engaged in harassment in *Franklin*[9] and *Gebser*," as "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Davis*, 526 U.S.at 653. The court understands this to mean, hypothetically, that an assessment of the severity of the harassment might depend on the identity of the perpetrator and his or her relationship with the victim, not that the other elements of a deliberate indifference claim are altered.

Applying *Kollaritsch* to the factual allegations in John Doe's Complaint, the court finds that the Complaint fails to plead facts showing that actionable harassment occurred in this case. The central event of which the plaintiff complains is the teaching of the "Let's Make a Slave" speech. Even though it occurred over the course of two days, it was a unified lesson with two parts. The court finds that teaching two units of a history class on two consecutive days does not satisfy the "pervasive" requirement. This lesson, standing by itself, does not qualify as actionable

---

[9] In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), as in *Gebser*, the plaintiff brought a Title IX action, seeking damages in connection with alleged sexual harassment and abuse by a teacher.

harassment, even if it might otherwise meet the severity and offensive objectionableness requirements.

The Complaint appears to claim that John Doe suffered repeated or pervasive harassment because, in addition to the "Let's Make a Slave" lesson, he was subjected to further harassment. First, the Complaint alleges that the lesson predictably "spilled onto the playground" (Doc. No. 19, at 7)), even after school officials had notice of the inappropriateness of the "Let's Make a Slave" lesson. The Complaint alleges that the other students "joked" about the Black History lesson, telling John Doe, "you are my slave" (Doc. No. 1 ¶ 26), but the Complaint does not distinguish whether Black children or White children were doing the joking or suggest how frequently or for what length of time this teasing occurred. The facts as alleged do not establish that this teasing was sufficiently "systemic" or "widespread" to qualify as "pervasive," but, even if it were, there is also no indication that it was sufficiently severe to qualify as actionable harassment. The Complaint itself refers to the other students' conduct as "joking," and, under *Davis*, "[d]amages are not available for *simple acts of teasing and name-calling* among school children, however, even where these comments target differences in [race]." *Davis*, 526 U.S. at 652. The alleged teasing does not qualify as actionable harassment.

The third event—Herman's teaching of the book *Freedom Over Me*—is not alleged to have been "harassing" *per se* but only because it was presented in the "immediate aftermath and context of a racially hostile environment" created by the teaching of the "Let's Make a Slave" speech. (Doc. No. 1 ¶ 29.) This book allegedly caused John Doe to experience additional fears only because, due to his developmental disability, he was "prone to ruminating and taking things literally." (*Id.*) In other words, the Complaint does not allege any facts suggesting that the book was objectively offensive to any fourth grader—even a Black fourth grader—who did not suffer

from the same disability as the plaintiff. Rather, the book was problematic for John Doe precisely because of his developmental disability. In *Kollaritsch*, the Sixth Circuit quoted a statement from Justice Kennedy's dissent in *Davis* to emphasize that the perspective of the individual victim is largely irrelevant to the question of whether some conduct is objectively offensive: "Indeed, the [*Davis* majority] . . . suggests that the 'objective offensiveness' of a comment is to be judged by reference to a *reasonable child* at whom the comments were aimed." *Kollaritsch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 678 (Kennedy, J., dissenting)) (emphasis added). The court finds that the Complaint provides no basis for concluding that the teaching of this award-winning book was objectively offensive to the average "reasonable" fourth grade child.

The court understands that the "Let's Make a Slave" lesson may have been ill-advised and developmentally inappropriate for the age group to which it was directed. The court also accepts that the entire incident was extremely traumatic for a sensitive child with autism. The court nonetheless finds that the teaching of the "Let's Make a Slave" lesson, standing alone, does not qualify as "actionable harassment," because it does not meet the "pervasive" criterion. The additional harassing acts to which the plaintiff points do not push it past that threshold, because the other events were not sufficiently severe or objectively offensive, respectively, to otherwise qualify as harassing. Thus, even considered together, the Complaint provides no basis for concluding that these events that so terrorized the plaintiff constitute actionable harassment on the basis of race. While the lesson in question may well have been especially inappropriate for John Doe as a student with a known disability, and even developmentally inappropriate for all fourth graders, that does not mean that its educational content constituted actionable harassment on the basis of race.

b) *Deliberate Indifference*

Moreover, even if the court presumes that the teaching of the "Let's Make a Slave" lesson over the course of two days qualifies as actionable harassment on the basis of race, to be entitled to recover damages from Metro under Title VI, the plaintiff "must also plead and prove four elements of a deliberate-indifference-based intentional tort: (1) knowledge, (2) an act, (3) injury, and (4) causation." *Kollaritsch*, 944 F.3d at 621; *see also id.* at 619 ("The school is 'properly held liable in damages only where [it is] deliberately indifferent to . . . harassment, of which [it] has actual knowledge . . . .'" *Kollaritsch*, 944 F.3d at 619 (quoting *Davis*, 526 U.S. at 650)). The Complaint fails to plead facts that would establish deliberate indifference on the part of the school.

In this context, "'[k]nowledge' means that the defendant school had 'actual knowledge' of an incident of actionable [racial] harassment that prompted or should have prompted a response.'" *Id.* at 621 (citing *Davis*, 526 U.S. at 650, 642, as rejecting an imputed-knowledge standard under agency principles or a "should have known" standard based in negligence). The "act" referenced by the deliberate indifference definition is not the harassment *per se*, but, instead, the school's unreasonable response, or failure to respond, to notice of such harassment. *See id.* at 621 ("'Act' means a response by the school that was 'clearly unreasonable in light of the known circumstances,' thus demonstrating the school's deliberate indifference to the foreseeable possibility of further actionable harassment of the victim." (quoting *Davis*, 526 U.S. at 648)). "Injury" "means the deprivation of 'access to the educational opportunities or benefits provided by the school.'" *Id.* at 622 (quoting *Davis*, 526 U.S. at 650).[10] And "causation" means that the

---

[10] A Title VI claim, unlike a Title IX claim, is not confined to discrimination arising in the context of an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Instead, it more broadly prohibits race discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. However, where the federal program at issue is an educational program, the injury requirement is necessarily identical to that of a Title

defendant's "act" (or failure to act) "caused the 'Injury,' such that the injury is attributable to the post-actual-knowledge *further* harassment, which would not have happened but for the clear unreasonableness of the school's response." *Id.* at 622 (citing *Davis*, 526 U.S. at 644); *see also Thompson v. Ohio State Univ.*, 639 F. App'x 333, 343–44 (6th Cir. 2016) (affirming summary judgment for the defendant university on the plaintiff's Title VI claim, where the plaintiff failed to show that the school's response to her discrimination complaint against a teacher was "clearly unreasonable in light of the known circumstances," in particular because she "did not raise any further harassment or discrimination with [the defendant's] HR office, nor did [the defendant university] have any other reason to believe that its efforts to remediate were ineffective or disproportionate" (quotation and editorial marks omitted)). Moreover, allegations of "further harassment" after giving notice, alone, are not sufficient; the unreasonableness of the defendant's response "must have caused the further harassment." *Kollaritsch*, 944 F.3d at 622 (citing *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 851 (6th Cir. 2016)).

In this case, Metro argues that, even assuming that the plaintiff could establish actionable harassment, he has not alleged that MNPS had "actual knowledge" of the "harassment" until the plaintiff's mother brought her objections to the attention of school administrators. (Doc. No. 12, at 9.) Metro contends that, upon being notified about the objectionable lesson, as alleged in the Complaint, the school acted reasonably by swiftly dismissing the student teacher and placing defendant Herman on administrative leave. (*Id.*) In addition, the plaintiff does not allege that he complained to administrators of further harassment after those actions. (*Id.* at 2, 9.) Metro further posits that the two post-lesson incidents that the plaintiff complains about—peer-on-peer teasing

---

IX claim: deprivation of "access to the educational opportunities or benefits provided by the school.'" *Davis*, 526 U.S. at 650.

and the teaching of the book *Freedom Over Me*—do not qualify as "additional" harassment required to establish the causation element of a deliberate indifference claim. (*Id.* at 10–11.)

In response, the plaintiff argues, first, that Herman himself and the unidentified special education teacher who allegedly also witnessed the lesson for "multiple days" are "appropriate persons" for receiving notice, because they had supervisory authority over the student teacher and could have either stopped the lesson from going forward or intervened when it became obvious that the lesson was inappropriate. (Doc. No. 19, at 4–6 (citing *Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937, 957 (E.D. Mich. 2020)).) Alternatively, the plaintiff argues that the response by school administrators, after receiving actual notice of the "Let's Make a Slave" lesson, was inadequate, because the school "undertook no corrective actions to wash the taught-filth from impressionable children's minds." (Doc. No. 19, at 7 (quoting Doc. No. 1 ¶ 25).) Instead, administrators became defensive, asserting that Vanderbilt's education department had "approved the material." (*Id.* (citing Doc. No. 1 ¶ 25).) As a result, the plaintiff claims, Metro is responsible for the further "trauma" suffered by the plaintiff as the "lessons spilled onto the playground." (*Id.*)

Finally, the plaintiff points to Herman's decision to teach from *Freedom Over Me* upon his return from administrative leave as further evidence that the administration's action (suspending him) was not effective to prevent additional harassment. The plaintiff asserts:

> [C]ontext matters. With *John Doe* already reeling from the slave enactment, *Freedom Over Me* is a book that puts prices on black adults and their children to emphasize a point . . . . For *John Doe*, with the context of the preceding, and his autism, he had yet additional fears of being sold. Obviously, he cannot distinguish figurative language and historical context. That is why he has a special education teacher.
>
> It is unimaginable that a teacher, special education teacher, and Metro's administration would leave a black child with autism—who takes matters literally due to his disability—inside a classroom where racism is being taught and re-enacted through vivid and vile lessons and enactments. But it did—intentionally—for days on end. And that deliberate indifference to such continued teaching caused severe emotional harm to John Doe in his own unique way.

(Doc. No. 19, at 8 (citing Doc. No. 1 ¶ 28).)

*MNPS's "Knowledge"*

The Supreme Court has recognized that liability under Title IX is "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser*, 524 U.S. at 290 (quoting 20 U.S.C. § 1682). *Gebser* involved a teacher who had a sexual relationship with a student. The student did not complain about it, but the relationship was eventually discovered, and the teacher was arrested and fired. The student and her mother subsequently brought suit against the school district, arguing that the teacher's knowledge should be imputed to the school. The Supreme Court rejected that contention, holding that "[a]n 'appropriate person' under [Title IX] is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* "The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation." *Id.* at 290. Otherwise, the Court held, "there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.* at 290–91. Under this scheme, "the knowledge of the wrongdoer himself is not pertinent to the analysis." *Id.* at 291.

Based on *Gebser*, the court rejects the plaintiff's contention that Herman and the special education teacher were "appropriate persons" whose knowledge of the objectionable lesson presented by the student teacher can be imputed to the school system as a whole. Arguably, if Herman and the special education teacher witnessed something they deemed to be harassing, they may have had an obligation to *report* it to administrators. The court in *Lipian*, in fact, recognized the distinction between individuals required to *report* suspected abuse up the chain of command

and those who could be deemed "Title IX 'appropriate persons,'" whose knowledge can be imputed to the school itself. *Lipian*, 453 F. Supp. 3d at 958. In this case, the Complaint contains no factual allegations suggesting that Herman or the special education teacher was an "official" whose knowledge would bind the school, irrespective of whether either of them had an obligation to report suspected abuse or whether they, in some respects, were considered to be the student teacher's supervisors. The school, accordingly, lacked "knowledge" of the "Let's Make a Slave" lesson until after it had occurred. Metro, therefore, cannot be liable for any harm caused by it. At most, Metro could only be liable for damages caused by school officials' response, or failure to respond, to that event, as discussed below.

## The Act and the Causation of Injury

For the defendant's "act" in response to the reported harassment to give rise to liability under Title VI, the plaintiff must plead and prove both that the response was unreasonable and that it caused "some further actionable harassment." *Kollaritsch*, 944 F.3d at 622. In this case, the plaintiff has pleaded neither. First, the allegations in the Complaint do not indicate that the school officials' response was unreasonable. They promptly relieved the student teacher of her duties and put Herman on administrative leave for several days while the school investigated. The plaintiff did not complain to the school about further harassment or otherwise put the school on notice that its remedial efforts were not sufficient. *Compare Stiles*, 819 F.3d at 850 (affirming summary judgment for the defendant in a Title IX case, distinguishing the facts from those in which it had denied summary judgment, "because the school officials . . . continued to use remedial methods they knew from past experience were inadequate in ending harassment of the plaintiff").

The plaintiff now claims that the school administrators were unreasonable because they should have taken steps to "wipe" the harmful lesson from its students' minds, but he does not

suggest how the school could have done so without further revisiting the purportedly traumatic lesson. Regardless, the Sixth Circuit has recently emphasized that "[t]he deliberate indifference standard makes schools liable when they refuse[] to take action to bring the recipient into compliance, not when they take action that ultimately fails to purg[e] their schools of actionable . . . harassment. *We ask not whether the school's efforts were ineffective but whether they amounted to an official decision . . . not to remedy the violation*." *Foster v. Bd. of Regents*, 982 F.3d 960, 968 (6th Cir. 2020) (quoting *Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 647, 642) (internal quotation marks omitted) (emphasis added). The plaintiff here does not allege facts showing that Metro's response amounted to a decision not to remedy the situation.

Second, the plaintiff has not alleged facts showing he suffered additional harassment after MNPS officials received notice. As discussed above, the "joking" around by John Doe's classmates, as alleged in the Complaint, was not sufficiently severe to qualify as actionable harassment. And the teaching of an award-winning book on the topic of race and slavery, while subjectively traumatic for the plaintiff, cannot be deemed objectively offensive and, consequently, also does not meet the definition of actionable harassment on the basis of race.

Metro is entitled to dismissal of the Title VI claim on the grounds that the allegations in the Complaint do not establish either that John Doe suffered actionable harassment on the basis of race or that the school was deliberately indifferent to a claim of racial harassment.

### 2. Section 1983 Claim

Count I of the Complaint asserts a claim under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Metro, as a municipality, is a "person" who may be liable under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Thus,

for Metro to be liable, the plaintiff must "identify the specific constitutional right" at issue and show how it was infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989) (additional citations omitted)).

### a) The Constitutional Violation

In this case, the plaintiff asserts a violation of his right to equal protection, secured by the Fourteenth Amendment to the U.S. Constitution. Although the Complaint does not actually spell this out, the claim is apparently premised upon the assumption that the same events that form the basis of the plaintiff's Title VI claim—the teaching of the "Let's Make a Slave" lesson and the *Freedom Over Me* book and the teasing by peers—created a racially hostile environment in violation of the plaintiff's right to equal protection. *Compare Young v. Pleasant Valley Sch. Dist.*, 601 F. App'x 132, 136 (3d Cir. 2015) (addressing § 1983 equal protection claim against a teacher based on allegations that the teacher, over the course of a semester, "regularly subjected [his classroom filled with sixteen- and seventeen-year old students] to references to sex and graphic depictions of nudity and violence that degraded women").

The Supreme Court has expressly recognized that "§ 1983 suits based on the Equal Protection Clause remain available" to plaintiffs bringing Title VI or Title IX discrimination claims against schools. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009); *see also Heike v. Cent. Mich. Univ. Bd. of Trs.*, 573 F. App'x 476, 482 (6th Cir. 2014). The Court has also recognized that the standards for establishing liability under Title VI and § 1983 "may not be wholly congruent." *Fitzgerald*, 555 U.S. at 797. As an example, a Title VI plaintiff "can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference," while a § 1983 plaintiff bringing an equal protection claim would need to show that the "harassment was the result of municipal

custom, policy, or practice." *Id.* at 797–98 (citing *Gebser*, 524 U.S. at 290, and *Monell*, 436 U.S. at 694).

Similarly, it is not entirely clear that the "actionable harassment" required to establish a claim under Title VI or IX is defined identically to the hostile-environment requirement of a § 1983 claim, as Metro argues in this case. (*See* Doc. No. 12, at 5–6 (asserting that, to succeed on his equal protection claim under § 1983, the plaintiff must "make an identical showing of deliberate indifference to severe, pervasive, and objectively offensive racial harassment").) In the Title IX context, as discussed above, the Supreme Court and the Sixth Circuit have defined "actionable harassment" as requiring aggressive conduct that is both severe *and* pervasive, as well as objectively offensive. *Kollaritsch*, 944 F.3d at 619 (citing *Davis*, 526 U.S. at 651). Equal protection claims based on race or sex discrimination, however, are governed by the same standards as those adopted in the context of Title VII employment discrimination claims. *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004). And, to establish liability for a hostile work environment under Title VII, a plaintiff must show that he was subject to unwelcome harassment that was "sufficiently severe *or* pervasive to alter the conditions of [a plaintiff's] employment and create an abusive working environment.'" *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (other citations omitted) (emphasis added).[11] This standard is both "objective and subjective," as the plaintiff must show that "the conduct [was] so severe or pervasive as to constitute a hostile . . . environment both to the reasonable person and

---

[11] That standard, applied to a § 1983 claim in the educational context, requires that the same harassment must affect the plaintiff's educational opportunities or academic performance. *See, e.g.*, *Hayut v. State Univ.*, 352 F.3d 733, 745 (2d Cir. 2003) ("Making a 'hostility' determination in the educational context . . . entails examining the totality of the circumstances, including . . . whether [the discriminatory conduct] unreasonably interferes with' the victim's academic performance.").

the actual victim." *Bradley v. Arwood*, 705 F. App'x 411, 417 (6th Cir. 2017) (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

*Kollaritsch*, applying the "pervasive" element in the Title IX context, specifically held that "pervasive" means "multiple incidents of harassment; one incident of harassment is not enough." 944 F.3d at 620 (citing *Davis*, 526 U.S. at 652–53). Conversely, in the Title VII context, the Sixth Circuit has recognized that a single, "isolated incident of harassment, if extremely serious, is sufficient to create a hostile work environment." *Ault v. Oberlin Coll.*, 620 F. App'x 395, 402 (6th Cir. 2015) (citation and internal quotation marks omitted).

The peer-on-peer teasing and the teaching of *Freedom Over Me* do not qualify, objectively or subjectively, as harassing, for the same reasons as those discussed in addressing the Title VI claim. However, while the court has found that the teaching of the "Let's Make a Slave" lesson was not sufficiently "pervasive" to satisfy *Kollaritsch*'s definition of actionable harassment, that factor is not determinative of whether a hostile educational environment existed for purposes of a § 1983 claim. The operative question is whether the lesson was sufficiently severe, both objectively and subjectively, under the Title VII standard. And, in that regard, the court finds that the allegations in the Complaint, *construed as true and viewed in the light most favorable to the plaintiff*, are barely sufficient to establish, at least for purposes of surviving a motion to dismiss, that the teaching of the "Let's Make a Slave" lesson was sufficiently severe, both subjectively to the plaintiff and objectively to a reasonable fourth-grade student,[12] to give rise to a hostile

---

[12] As quoted previously, the Complaint alleges that the "Let's Make a Slave" lesson was "vile, hurtful, and *obviously inappropriate* for fourth graders" generally, not just for John Doe, and that the material graphically describing the horrific punishments visited upon enslaved people was "obviously racially hostile material" for "impressionable fourth graders." (Doc. No. 1 ¶¶ 14, 15.) The defendants dispute many of the facts as alleged by the plaintiffs (*see, e.g.*, Doc. No. 9, at 2 n.1), but the court must presume their truth at this juncture.

educational environment.

> b)    *Deliberate Indifference*

The next question is whether Metro can be liable for that incident. The standards under § 1983 and Title VI for that showing are not necessarily identical either, as the Supreme Court recognized in *Fitzgerald*. The § 1983 theory of recovery articulated in this case is that Metro is liable for the alleged equal protection violation, because the MNPS "failed to train student teachers, administrators, and Board members about racial harassment, how to prevent and manage same" and, by being "deliberately indifferent about the need for such training," caused injury to John Doe. (Doc. No. 1 ¶ 36.) That is, the focus is not on what the defendant did or did not do in the wake of being notified about the alleged harassment, but on what it might have done to have prevented it from occurring at all.

To establish municipal liability, the plaintiff must show that the municipality's policy or custom caused the alleged injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 690–91). One way of doing that "is to show a policy of inadequate training." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Berry v. Delaware Cty. Sheriff's Office*, 796 F. App'x 857, 861 (6th Cir. 2019) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)), *cert. denied*, 140 S. Ct. 2671 (2020). To prevail on a failure to train claim, a plaintiff must show that "(1) the training . . . was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700 (citation omitted). Only when a municipality's failure to train rises to the level of "deliberate indifference" does this failure become a "policy or custom that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

The Sixth Circuit has identified two situations justifying a conclusion of deliberate indifference in the context of failure to train claims: (1) the failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction; and (2) when a city fails to act in response to repeated complaints of constitutional violations by its officers. *Ellis*, 455 F.3d at 700–01 (citing *City of Canton*, 489 U.S. at 390 n. 10; *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). In this case, the Complaint does not allege that Metro failed to respond to repeated complaints of constitutional violations by school teachers and, in fact, does not point to any other instances in which the teaching of slavery as a historical reality has given rise to an equal protection violation. Instead, the Complaint asserts that it was inherently foreseeable that teachers would violate students' rights to equal protection if not trained or supervised properly about what constitutes "acceptable content." (Doc. No. 1 ¶ 32.) Metro argues that the § 1983 claim is subject to dismissal under Rule 12(b)(6), because the Complaint fails to articulate any specific facts that would support a finding that "offering educational instruction on slavery constitutes an unreasonable and obvious risk of racial harassment." (Doc. No. 12, at 2; *see also id.* at 13–14).

To support this type of failure to train claim, "the plaintiff must show that the need to act should have been 'plainly obvious to the [municipality's] policymakers, who, nevertheless, are deliberately indifferent to the need." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648–49 (6th Cir. 2012). Cases within this category arise "'in a narrow range of circumstances' where 'a violation of federal rights may be a *highly predictable* consequence of [the municipality's failure to act].'" *Id.* at 649 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). Thus, for example, "where city policymakers know that their police officers will be required to arrest fleeing felons and have armed the officers with firearms in part to accomplish this task, the need to train the officers in the constitutional limitations on the use of deadly force is 'so obvious, that failure to do

so could properly be characterized as deliberate indifference to constitutional rights.'" *Id.* (quoting *City of Canton*, 489 U.S. at 390 n.10) (some internal quotation marks omitted); *accord Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) ("Evidence of 'a pre-existing pattern of violations' is only unnecessary 'in a narrow range of circumstances,' 'however rare,' in which 'the unconstitutional consequences of a failure to train' are 'highly predictable' and 'patently obvious.'" (quoting *Connick*, 563 U.S. at 63–64); *Est. of Davis ex rel. McCully v. City of N. Richmond Hills*, 406 F.3d 375, 383, 382, 386 (5th Cir. 2005) (emphasizing that "a single incident is usually insufficient to demonstrate deliberate indifference and holding that, to overcome the presumption that a single incident is insufficient, the plaintiff must show "that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation" (citation and internal quotation marks omitted)).

The Complaint in this case does not allege that any other teacher at John Doe's school, or at any other school within Metro, has ever faced disciplinary action for teaching (or allowing a student teacher to teach) material that violated the state and local guidelines for the teaching of slavery as a part of American history or, more specifically, for teaching the topic in such a manner that it gave rise to a racially hostile educational environment. The absence of other incidents is relevant, as it "has a bearing on the inherent foreseeability of the issues that might arise in the classroom." *Curry ex rel. Curry v. Sch. Dist.*, 452 F. Supp. 2d 723, 732–33 (E.D. Mich. 2006), *aff'd*, 513 F.3d 570 (6th Cir. 2008). "The point, of course, is that the lack of prior incidents reinforces the conclusion that a reasonable administrator cannot be found to have been deliberately indifferent to the need to train for unlikely happenings." *Id.* Moreover, the lack of prior incidents "forecloses the possibility of a finding of deliberate indifference on the basis of 'evidence showing

that the municipality possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations.'" *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, No. 2:11-CV-15481, 2013 WL 3148272, at *17 (E.D. Mich. June 19, 2013) (quoting *Heyerman*, 680 F.3d at 648 (citation omitted).

As previously stated, the plaintiff alleges in the Complaint that the state and Metro had standards in place for the teaching of this particular era of American history and that the lessons presented by Herman and the student teacher were not consistent with those standards. (Doc. No. 1 ¶ 14.)[13] The fact that these standards were in place certainly substantiates, as the plaintiff argues, that Metro, MNPS, and Metro teachers "all knew to a moral certainty that fourth grade students, some with disabilities, will be taught, every year, about slavery. Thus, they certainly knew they would be faced with the question of how to properly teach the subject." (Doc. No. 19, at 11.) But it does not suggest that Metro had any reason to suspect that teachers would not comply with those standards or that additional training on how to teach this topic was required.

The plaintiff also claims that Metro "concedes" that the "Let's Make a Slave" lesson did not follow the standards approved by Tennessee and Metro for the teaching of the relevant period of American history[14] and argues that, because a teacher's duties involve developing lesson plans and making choices about how to teach difficult subjects "without creating a racially hostile environment," proper training would include "not only adherence to the above standards, but also

---

[13] The Complaint alleges very broadly that the "Let's Make a Slave" lesson was "obviously inconsistent with Tennessee's approved standard for teaching Fourth Grade Social Studies on the topic of 'The History of the United States: Revolution to Reconstruction,' and MNPS's approved Scope and Sequent for teaching 'The United States Prior to the Civil War' or "Civil War and Reconstruction,'" without actually identifying what those standards are. (Doc. No. 1 ¶ 14.)

[14] Metro "concedes" only that the student teacher's lesson, although "approved by Vanderbilt," "was not part of MNPS's approved curriculum" (Doc. No. 12, at 7), not that it did not meet the state and local standards.

. . . what would constitute racial discrimination and racial harassment." (*Id.* at 11–12.) Indeed, this allegation cuts against the plaintiff's argument. Since Tennessee and Metro had implemented standards for teaching the relevant material, as the plaintiff alleges, it follows that Metro expected its teachers to follow such standards and to develop lesson plans consistent with such standards. The plaintiff does not allege that Metro was generally on notice that teachers were not following the prescribed standards, nor, as discussed above, was Metro on notice about this particular lesson prior to its presentation. As the Sixth Circuit has stated in a similar context, "a school district is not liable if its employees simply choose to disregard [its] handbook and all common sense." *Beard v. Whitmore Lake Sch. Dist.*, 244 F. App'x 607, 611 (6th Cir. 2007) (internal quotation marks and citation omitted). As in *Beard*, "while the need to have some policy" about the teaching of slavery might be obvious, "the need to have a training program above and beyond the policy" was not obvious here. *Id.*

The Complaint does allege that "MNPS failed to train its employees on how to prevent racial harassment," that "such training . . . is necessary, but MNPS failed to conduct it," and, further, that "there existed an *obvious* need for training to prevent" constitutional violations generally. (Doc. No. 1 ¶¶ 31–32.) At the same time, contradictorily, the Complaint also asserts that the "Let's Make a Slave" lesson as proposed by the student teacher, was "so vile, hurtful, and *obviously inappropriate* for fourth graders that any sane educator would reject such a 'lesson' as being obviously inconsistent" with state and local approved standards. (*Id.* ¶ 14 (emphasis in original).)[15] The court accepts as true the allegation that no training was conducted, but the

---

[15] The fact that Vanderbilt University (with its preeminent Peabody College of education and human development) apparently approved the lesson plan (*see* Doc. No. 1 ¶ 25) suggests that the lesson was not so obviously inappropriate as the plaintiff alleges. For purposes of the Motions to Dismiss, however, the court accepts that the lesson was "obviously inappropriate" for fourth-grade students. (*Id.* ¶ 14.)

plaintiff's claim that such training was obviously necessary is a conclusory assertion unsupported by the actual facts. Moreover, the allegations that the "Let's Make a Slave" lesson was patently inappropriate for fourth graders due to its graphic nature refutes the plaintiff's contention that additional training was necessary or would have been effective.

In similar contexts, courts have recognized that, where the alleged conduct was obviously wrong, additional training was neither warranted nor likely to be effective. *See, e.g.*, *Sturdivant v. Blue Valley Unified Sch. Dist.*, 469 F. Supp. 3d 1121, 1134 (D. Kan. 2020) (noting that courts have regularly "rejected failure-to-train claims based on a municipality's failure to train employees" on race discrimination and retaliation, "the illegality [of which] is patently obvious to all") (citing *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1221 (N.D. Ala. 2012) ("The court finds that the 'proper response'—race discrimination is not allowed—is obvious to all without any special training."); *Young v. Pleasant Valley Sch. Dist.*, No. 3:07cv854, 2010 WL 55711, at *10 (M.D. Pa. Jan. 4, 2010) ("The offending conduct here—retaliation—is the sort of behavior that is so obviously wrong and contrary to right that an ordinary person could recognize it as inappropriate even without any additional training, and thus failing to provide more training on retaliation would not obviously lead to a constitutional violation and does not constitute deliberate indifference."), *aff'd*, 601 F. App'x 132 (3d Cir. 2015). Likewise, here, the plaintiff's allegations that the "Let's Make a Slave" lesson was so "obviously inappropriate" that "any sane educator" would have rejected it means that "an ordinary person" would have recognized it as inappropriate without further training, such that failure to provide additional training would not constitute deliberate indifference.

Because the factual allegations in the Complaint, construed as true, fail to establish deliberate indifference, the § 1983 claim, too, will be dismissed for failure to state a claim for which relief may be granted.

### B. State Law Negligence Claim

Both Metro and Herman move for dismissal of the common law negligence claim (Count III). This claim is not dependent on any federal statute or federal Constitutional violations. Having determined that the claims over which the court has original federal question jurisdiction should be dismissed for failure to state a claim for which relief may be granted, the court will decline to maintain supplemental jurisdiction over the state law claim. 28 U.S.C. § 1367(c)(3). Count III, therefore, will be dismissed without prejudice to its being re-filed in state court, if appropriate.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant Metro's motion to dismiss with prejudice the Title VI and § 1983 claims against it. The court will decline to exercise jurisdiction over the negligence claim. That claim will be dismissed without prejudice as to both defendants, and defendant Herman's Motion to Dismiss will be denied as moot. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge